Good morning, Your Honors. May it please the court. Heidi Stone on behalf of Defendant Appellants. I would like to reserve two minutes for rebuttal. All right, what's your clock? Qualified meeting analysis turns on circumstances. This is why this court should be clear about the circumstances surrounding defendants as a whole, as well as each defendant individually. This includes what Mr. Rico complains about and what portion of that is actually caused by defendants or within their control. Then I will discuss how considering these particular facts and defendants conduct, it would not have been clear to every reasonable official in their position that what they did during that time was unconstitutional and therefore deserving of the qualified meeting protection. Mr. Rico complained that the noise caused by the Guard One system at Pelican Bay State Prison deprived him of sleep. He said that his claim, though, is not about the checks themselves, but about how defendants implemented the checks. But as Mr. Rico himself admits in his report, it doesn't change the fact that Guard One checks at Pelican Bay were inherently noisy. Coleman ordered recommendation by the Special Master and his expert control the frequency, the equipment, and the location of these checks, none of which were defendants control. The checks had to be done every 30 minutes or every hour during the night. I want to ask you a question about that point. At the stage of this case, we have to accept the through the plaintiff's complaint process, he was assured at multiple levels that efforts would be made to try to reduce noise. And the allegation in the complaint is that despite those promises, that never happened. But why isn't that enough at this pleading stage of this case go forward? Your Honor, while the defendants, um, Your Honor, we do accept Mr. Rico's allegations is true at this stage of litigation. And we, we assume that these are the best facts that he's given after two amendments to the complaint and with the assistance of counsel. As to Your Honor's point, it's, it's not about what the defendants did, or did not do that cause sleep deprivation. But here is about the that they had to conduct these checks based on this court order. Could they have thought that what they were doing in their attempts to obey this order was unconstitutional or was constitutional or lawful? And the answer is no. Let's take a look at let's take a look at the order. There's nothing in the order that says you can use any method and means of ensuring that there is no suicide. And that there isn't anything in the order that says that we don't care if you do it loudly, or you create excessive noise. You just do it. Isn't that right? Isn't it that that really a distinguishing feature, and that the court found below that there is a there's a separate right to to ensure that you that the Eighth Amendment protects against excessive noise? That's exactly the point, Your Honor. The order just simply says to conduct these checks at Pelican Bay starting in August 2015. There was no qualification to these checks to the order. It wasn't you have to fix these doors before you conduct these checks. You have to make sure to not you know, make a certain type of noise or you have to make sure not to run up and down the stairs. There was no specific instructions about how these noises were going to be conducted or how these checks were to be conducted. It's just to conduct these checks. And that's what the defendants did. There is no violation of the court order. And that's not what Mr. Arrico alleges here either. Well, there wasn't there. You can't say that it wasn't a violation of the court order. The court order was very broad. And it is a contrast to the Hines case, which the receiver had been appointed. And here, the receiver had significant responsibilities, whereas here, the special master only had some responsibilities. And they were doing the best you can to ensure that there are no there that we ensure that there are less suicides or no suicides. And they offered a method and means of doing so. But they didn't say you can do precisely what you want to and create excessive noise. And also, it seems to me that the prison recognized this along the way, historically. Your Honor, to your point about Hines v. Yousef, the court took into account the involvement of the federal court and the receiver to conclude that knowing their involvement, a reasonable official could have believed that they were not violating inmates' Eighth Amendment rights. It wasn't whether they actually believed or not. Knowing that the Guard One checks were court mandated and special master approved and meant to benefit inmates, defendants here could have believed they were complying with the Constitution when they attempted to obey these orders. And it should be evaluated. Mr. Rico complains about Mr. Warden Dukart's response to his group grievance, which was filed only four days after Guard One was first implemented. The grievance complained that the Guard One system as a whole was depriving inmates of sleep and mentioned nothing about any of the defendants or their specific conduct, except that the checks were loud. Yes, Your Honor. Counsel, I guess one of the concerns I have here is we're dealing with an inmate who is in the shoe at the state's highest security prison. It's the California equivalent of of our Supermax facility at Florence, Colorado. And I'm assuming, I've never toured Pelican Bay, but I'm assuming that they have steel doors that are very loud every time they're opened and closed. Maybe that's not in the record and maybe that'll have to be fleshed out, but is that right? That is exactly what Mr. Rico complains about, is that the doors make noise when they open and close and that the structure of the facility with metal stairs and the concrete walls reverberate the sound. Yes. And I'm assuming some of those doors are probably electromechanical that are operated from a control room as opposed to simply a key that opens a door so that the guard really doesn't have any control over how much noise it makes when the door is open and That's correct, Your Honor. And then did the order specify that the checks had to be made every 30 minutes and didn't it give less than, no more than five minute leeway to conduct those 30 minute checks? Yes. And that could explain why the guards are running up and down the stairs if they're running behind on their checks depending on how many they have to do when they make their round? Yes, that's absolutely correct, Your Honor. And then I think, I don't know if this was in the of the Guard One system and it's a metal reader that you have to touch with a steel baton in order to get it to register, is that right? That's also right. So is it your position that under all of that, with the system that the court specified, no reasonable official could understand it by complying with the court's order even though everybody acknowledges it made noise that he is intentionally violating the inmate's constitutional right? That is absolutely correct, Your Honor. Mr. Rico's allegations make clear that any use of the Guard One, even if done with due care, would be noisy and disruptive of sleep. So in that context, the question to ask is, could an officer reasonably believe that doing the checks faster but making extra noise in this process would be better than doing them slower and continuing to elongate the disruption, kind of like ripping off a band-aid? And the answer is yes. It that's all that matters for the second prong of qualified immunity, that what they did may have been regrettable and that it may have caused sleep deprivation or woken up some inmates. But the fact that it's arguably constitutional and that the fact that qualified immunity provides ample room for mistaken judgments and reasonable error is why they are deserving of this protection. Well, what concerns me is I don't understand why the district court let some of the officials off, but not all of them. I mean, if the system is specified by the court order and it's depriving the inmates of sleep, then it seems to me if there's liability here, everybody's liable, from the warden on down. Or everybody's entitled to qualified immunity because they were carrying out the court's order. I just don't see how you can parse out individual correctional officers from higher up. Defendants agree with your honor that all the defendants in this case deserve qualified immunity. Looking at their specific conduct, for instance, at Warden Dukart, who just responded to his official grievance saying, sorry, we can't change the guard one system because this is mandated by the court. We can't keep the pod doors open because of obvious security reasons, but we're trying to make as little noise as possible. In his response to that, under these circumstances, it can't be said that the warden was acting unreasonably. And same with the other officers that responded to the informal request forms. I mean, I understand that argument before any inmate has made a complaint, but once the inmates start complaining, how is that not a factual question? Your honor, in this case, when the, when CDCR learned about inmate noise complaints and the fact that it might be waking some inmates up, as early as October, 2015, they notified the Pullman court and the special master and plaintiff to do something about it. And in fact, in December, it was CDCR who proposed that the checks be done every one hour instead of every 30 minutes at night. In that instance, they were acting reasonably to try to alleviate the situation and to help inmates in this noisy kind of environment, while still trying to comply with their order. It does not make sense on whether they're going to do this system, the Guard One system at all. And that argument makes a lot of sense in that context. But the second question is how they're doing this Guard One system. And that's where I'm struggling with, how is that not a fact question? And based on the nature of the pleadings, how does this case end right now, instead of when you have a more factual record to look at? Your honor, as I explained, the, we, we assume Mr. Rico's facts to be true. And even based on the, the allegations that the defendants are still deserving of qualified immunity, going to the floor officer's actions about conducting these checks haphazardly. The, there were three things that were mentioned that were examples of this, which was rushing through the checks or running up and down the stairs and hitting the buttons more than once. And in the magistrate judge's own words, these allegations are certainly minimal. It's also important to note that only one of the officers, Officer Nelson, is the one that conducted the checks at night. The rest of them, they conducted, conducted these checks during the day, where there's already a lot of movement, noise, and activity going on. For qualified immunity purposes, at least for the second prong, we must consider that it may not have even crossed their minds that what they did during this time would wake inmates up when they're already up. But no matter what time of day, all the floor officers were faced with this binding court order that required them, required them to do these checks frequently, using this certain equipment. And so was it at least reasonable for them to believe that doing them, even if it costs some noise, was still within the bounds of the Constitution because they knew that they had to obey these orders, even if they did end up running up and more than once. And this, this is the high security unit, right? So even during the day, we're not having inmates out in a day area or in a yard together. This is, this is the highest secure area of the prison where you're basically in your cell 23 hours a day, and when we move you out of the cell, you're moved by several correctional officers, one inmate at a time, right? So I guess I'm back to my puzzle about why the district court drew the line here between the night watch supervisors and the day watch supervisors when there's no change in the administrative operation of the SHU, whether it's day or night. That's correct, your honor. And that is why we believe that everyone in this case, including the defendants before you, deserve qualifying immunity. Let me ask you, let me ask you a question though, because you rely substantially on the Hines case. Isn't there a, let me see if you acknowledge that the Keenan case does say that excessive noise can be a violation of the eighth amendment because, in fact, it's sleep deprivation. Yes, your honor. Whereas in the Hines case, the court found without any question that there's no authority that exposing somebody to valley fever is a violation of the eighth amendment. So there's a big difference there in terms of relying on that case, in addition to the fact that here, in terms of the history of what the special master was doing, is the special master didn't deal with initially the issue of excessive noise. There's two competing issues. One was to ensure against suicide. So they offered, the special master offered a method and means of doing so. Then it was brought to the special master's attention that there's too much noise and said, well, let's change it and let's qualify the amount of time. But then after that, the matter just was dropped despite the fact that the defendant or that the petitioner plaintiff, along with many others, complained about, well, you're still creating excessive noise. And there's nothing in there, I return to this, there's nothing in that order that says you can do anything you wish to do in order to ensure that there are no suicides. Correct? Am I right? That's correct. Okay. So isn't that a substantial difference, but I agree with you. Let me move on to the other. I agree. And I'm going to ask opposing counsel about whether or not their personal knowledge of each and every person that has been alleged or every defendant that has been alleged to have violated. And that's certainly an issue. But at least one of them, and that would be who was there at night, certainly was responsible. And he was, Rico and the other plaintiffs complained about him. Your Honor, the officer that you mentioned, the one that did the checks at night, Officer Nelson, there is nothing in Mr. Rico's complaint to show that he actually knew about this, knew about the way that he was doing the checks was somehow waking up inmates or whatnot. But to your point, inmates sometimes complain about things that aren't necessarily unconstitutional. So even if the officers are aware of noise complaints, they might not necessarily be aware of unconstitutional conduct on their part. Okay. Let me just interrupt you a second. But that gets to precisely what Judge Hunsaker said, because those are issues of fact. We take all reasonable influences. And this is a substantial Second Amendment complaint, more than I think in my experience that I see in these civil rights cases. So that's going to be established. It doesn't mean that later, I suppose at some point, I've seen it before, that the qualified immunity issue can surface again. As to that point, Your Honor, this court in a state of Ford v. Ramirez-Palmer said that a reasonable prison official could know of all the facts, know of all the facts that Mr. Rico pleads, know of the noise complaints, know the fact that they're causing sleep deprivation, but still mistakenly, yet reasonably, perceive that the exposure or the risk was not that high. And if so, that they are still deserving of the qualified immunity protection. I know that my time is up. Is it okay if I just address your point about the Keenan v. Hall? Okay, thank you. In Keenan, this is the best case that Mr. Rico provides to show that the law was clearly established, but there's only three sentences dedicated about noise. The noise described in Keenan is about inmates constantly screaming and singing and yelling, and the officers didn't do anything to stop it. The biggest difference in Keenan and here is that inmates were making the noise, not prison officials. And the case doesn't involve anything about welfare checks or noise that are made from that, let alone a welfare check that's court mandated. And there's no discussion of conduct even remotely close to what defendants here did. And because the facts are so different, it's doubtful that any reasonable official reading this would know beyond doubt or beyond debate or so clearly that what they did violated the Constitution. Thank you. Even though there's been complaints? Yes, Your Honor. And even if they are aware of the complaints, it's the awareness of unconstitutionality that matters for qualified immunity purposes. Great. We'll hear from your opponent, and then I'll give you a short amount of time. So Ms. Faulkenstein? Thank you, Your Honor. Can you hear me all right? Yes. Great. I'm Kate Faulkenstein. I think the key issue here is that it's a rare case where it's appropriate to dismiss at the pleading stage based on qualified immunity. If there are disputed facts or inferences that could be drawn either way or unknown facts that would affect whether qualified immunity applies, then I don't think qualified immunity is appropriate yet. And that's all that has to be decided in this particular appeal. I think the fundamental dispute between the parties is whether the prior case law is sufficiently factually similar to the facts here. And as I understand it, defendants are raising sort of two factual distinctions. One, which is so was discussing at the end, is that the noise was different. It's a different type of noise that woke people up as compared to past cases. The other is that the checks themselves were court ordered. I don't think either of those distinctions is a reason why it wasn't clearly established, but under these facts, subjecting inmates to sleep deprivation through excessive noise was unconstitutional. Did the court choose the Guard 1 system? Was that specified in the order? The special master, well the special master's expert actually, I believe. There's sort of three layers of approval here. So the special master had appointed an expert. The expert issued a report that did say Guard 1. The special master then issued an order adopting the expert's report. And the court then issued an order adopting the special master. So indirectly, yes. So the answer is yes, it's actually specified in the court order. Yes. So I mean, one way to do these checks would be to simply wake up or open the cell door and walk in every 30 minutes and see if the inmate is breathing or tapping them on the shoulder and say, are you okay? But that would not have been authorized under this order. The guards had to record it. I suppose there could be a question of whether they could also walk into the cell after they tapped the metal button and wake up the inmate. And I would argue that that would definitely be unconstitutional if they added that gloss to what was ordered by the court. Well, the question is, if the court ordered them to do that and they are carrying out, in good faith, the court's order, why shouldn't they be entitled to qualified immunity, even though the order results in disruption of sleep? Because Mr. Rico's damages claims aren't about merely using Guard One. It's about how they implemented Guard One. And that goes beyond what the court ordered. I think they're reading a lot into the absence. You heard my question to opposing counsel about the system itself. It's a steel or metal based system, right? It's a metal reader and you have to tap it with a metal baton in order to get it to record the fact that the inmate was there at the appointed hour. That's right. And I do think the system inherently creates some noise. But for the purposes of Mr. Rico's damages claims, he's only complaining about the noise from the implementation. If there's some sort of causation question about... But again, if the correctional officer is doing what the court ordered the correctional officer to do, how can we say that a reasonable officer would know that he was violating constitutional rights of the inmate in carrying out the court's order? Because they made separate decisions of their own that are specifically alleged in the complaint that went beyond the court order. They made choices like not repairing the pod doors, which the complaint alleges needed fixing. They hit the buttons multiple times, which was not the standard Guard One system. Counsel, this is a steel and concrete facility, is it not? With very heavy doors. It's designed that way because of the type of inmates that were incarcerating there. That's right. But these... Sorry. Are we holding the correctional officers responsible because the state built a facility to be as secure as possible for this type of inmate? No, they're not liable for the design of the facility. They're liable for the choices they made that were within their discretion within that context. And what discretionary decisions did they make? Specifically, they hit the buttons more than once each time that they walked by, which significantly increases the noise. They hit them harder than necessary. Instead of just tapping the button, which could be much quieter, they whacked it. How do we know that? Because the complaint alleges that? So, I mean, it may well be that we do need some factual discovery on how sensitive these devices are and whether or not sometimes it doesn't read the first time you touch it. As I understand the system, it's like a night watchman system in a manufacturing plant where we want to make sure that the guard is maintaining his fire watch. And so he goes around and he puts his key in or whatever, however the system works to prove that he was there at the particular time. That's what this is, right? Yeah, that's exactly right. And I understand the defendant's position is that they were doing the best they could in the context of that system. They were being as quiet as they could. The problem is that that's not what the complaint says. And we should have discovery on whether or not defendants had discretionary choices and made discretionary choices beyond merely using the system or whether the system would have been perfectly quiet if it had been done well. If the question is whether or not the system itself versus the implementation choices are the cause of the sleep deprivation, that's a disputed fact about causation that should be subject to discovery. What the complaint alleges is that there are choices, specifically identified choices that the defendants made, and that Mr. Rego complained about those specific implementation choices. I wanted to address this notion that came out of the reply brief in an oral argument that they wouldn't have known from the grievances that he was complaining about implementation. They would have thought he was complaining only about the system itself, because that's simply not true. The complaint actually directly alleges, sorry, and the grievances directly allege problems about implementation. So defendants are relying on quotes from the grievance that was attached to Mr. Rego's first pro se complaint, which is in the administrative record at ER 110 to 118. That's just an excerpt of his complaint to be clear. But even in that excerpt, if you look at it, he made claims that are specifically about implementation. Like at ER 117, he asked them to, quote, fix the door. And at ER 118, he talked about the stomping or running of correctional officers up and down the stairs. And the un-excerpted... Sorry. I want to focus you in on one issue before we run out of time. Yes. What is your opinion with regard to the day watch officers? I'm sorry, I couldn't hear you with regard to what? With the daytime officers? Yes. So I think that this is a new argument in the reply on appeal. I had not heard anything before that about the idea that the day watch officers should be dismissed specifically. But to address it, I think what the complaint says is that they worked on the second or third watch. It doesn't contain any information to evaluate whether or not inmates sleep during those hours. And I think they may well. The second watch starts at 6 a.m. But wouldn't you need to allege that? Wouldn't you need to allege that something that the day officers did was causing your client to lose sleep? So the complaint does allege that those specific officers engaged in the concrete implementation problems that made the checks too noisy to sleep. If you think that there's a need to specifically allege that he sometimes slept at those times or tried to sleep at those times, I think that would be a reason to replead rather than dismiss. But I actually think the noise specifically during the day exacerbates Mr. Rico's symptoms. So there are allegations specifically about the daytime noise. Noise from the system or just general noise in the block? Noise from the execution of guard one specifically during the day. Go ahead. I'm sorry. I didn't see that. I didn't see that in the complaint. And as I mentioned before, I think this is a rather substantially, essentially clear complaint in terms of all the factual allegations. But I didn't see that. And that's a problem that I have too, is you have to show personal involvement in each and every person that you allege that seems like you are potentially inferentially saying that, well, maybe the complaint is not clear or not clear enough on each and every one of the individuals. But that's not enough on appeal, is it? So I do think that there are clear allegations about each person. If we're talking specifically about the day correctional officers, I would direct you to paragraph 41, which talks about issues during the day. And I think it's paragraphs, specifically the implementation problem, that's at paragraph 35 and 36 for the floor officers. Paragraph 41 says that the guard one system prevented your client from concentrating during the day. There's nothing there about sleep deprivation. It says it exacerbated his symptoms is the part of it that I'm focused on. So he was unable to sleep at night. The excessive noise during the day made the symptoms of that sleep deprivation even worse. So it contributed to the harm that he experienced. But again, if that's not sufficient, I think we could replete to add more allegations about his attempts to sleep during the day. If that's necessary, I don't think that it is. And at a minimum, that affects only three of the defendants. I still think that there are specific allegations about all of the remaining defendants. As to the slightly more senior defendants, the supervisory ones and the warden, there's allegations about which specific grievances each person read that would show that they knew that there was a problem and that they failed to address that problem. So I think there are specific allegations. Well, and I'm wondering if that's Abernathy and Cousy and Marrelli and Perry. I'm wondering where in the complaint it is specific enough to show their personal knowledge of it that they failed to train the staff. So paragraphs 46 to 51 show the knowledge of each specific supervisory defendant because it goes through each grievance and lists which specific supervisory defendant read and signed that grievance. And then paragraph 52 alleges that after reviewing those grievances that each one of them reviewed, they didn't take action to solve the problems listed in those grievances. So that does tie each defendant to the knowledge of the problems and specifically the implementation problems, not just the existence of the system itself. In fact, in some of the unexcerpted parts of Mr. Rico's grievances that are in the record below on the initial complaint, that's docket one in the district court. For example, on page 32 there, Mr. Rico's complaint specifically reads, you can continue with your welfare checks. All you need to do is not create excessive noise. So I do think it was clear that the problems were around the excessive noise created by the implementation and not the existence of the checks in the abstract, not solely the existence of the checks in the abstract. So if you remind me, I mean, there is a difference with Pelican Bay and that's, and actually the judge and the special master took that into account and made the changes, am I right? Yes, those changes happened partway through the damages period of issuing this complaint, but yes. Is it because they delayed making the findings or making recommendations and requirements because of Pelican Bay because it was entirely different, correct? They changed the frequency of the checks to once an hour instead of twice an hour at night. Because of the particular circumstances and conditions there. Yes, exactly. For that is when the problems started to occur and the grievances were filed and there was some attention made to it, but then I think that, as I recall, at least the warden paid attention to it in the beginning and I don't see how the warden is anyway, has personal knowledge. The warden, I'm sorry, where you have established that the warden can be the least bit responsible? Yes, so Mr. Warden Dukart reviewed all the grievances that are addressed and you can see in paragraph 46 and 47, he reviewed those specific grievances, so he was aware of the problem. Now, I understand that at some point, several months into the damages period, he, someone from CDTR, and I don't know the involvement of the warden in this decision, may have reduced the frequency of the checks, asked to reduce the frequency of the checks, but that doesn't address the specific implementation problems that are at issue in the complaint. The refusal to repair the doors, the hitting of the buttons more than once, the hitting the button hard instead of just touching it, the warden was aware of those implementation problems because he saw those. Is that in the complaint? That's where I'm having a problem, is I don't see the connection between the warden and those allegations and I know that it's a feared process. It is in the complaint at paragraph 46 and 47, it says Warden Dukart reviewed those specific grievances that, and then in turn, that you know that the grievances were complaining about these problems, so that shows that he knew about these problems. That's the allegation. But then he took action. He didn't take action to fix the specific implementation problems. At most, someone at CDCR changed, advocated to change the frequency of the checks. It's not clear if the warden had any involvement in that. I don't know and there's nothing I know of in the record that says who precisely at CDCR asked for the reduction in frequency, but my point is that the reduction in frequency is not the implementation problem complained about in the damages, allegations in this complaint. It's those specific things and he didn't fix those specific things by, for example, supervising to stop them from hitting the buttons so hard or so many times or repairing the doors and he was aware of those. The complaint alleges that that conduct continued even after the checks were reduced to hourly. The complaint alleges that no actions were taken to make the Guard One checks quieter. That's in paragraph 52. That to me reads as a broad statement that no actions were taken to address these problems across time. It doesn't specifically say that that's also true from 2016 onward, but it certainly doesn't say it's not and I think at this stage with all inferences taken in our favor and the allegation that there was nothing done to solve those problems, that's enough. The answer just merely denied all of this. I see I'm out of time. May I answer your question? Never mind. Okay, thank you. Thank you, counsel. So we'll give you two minutes for questions. So the second problem of qualified immunity is not about whether defendants knew what they did was wrong. It's about whether they knew they violated the Constitution and that's where the case law comes in. That's why the focus on case law of quality is the second problem of qualified immunity is crucial because it's whether there was case law at the time that would have given fair warning or notice to all the officials that their specific conduct, whether it was running up the stairs or touching the buttons more than once or answering these grievances would be unconstitutional. And that again goes to the awareness of noise complaints, the awareness that this was going on and depriving inmates of sleep is different from awareness of unconstitutionality and the awareness of unconstitutionality comes through case law. Not only that, in this case, the office... Yes, your honor. Do you agree that at this point in the case where we're just looking at the pleadings that we have to accept that nothing was done to make these checks quiet? Yes, your honor. We would have to accept that. Yes. But even... Also accept that in contrast to the Hines case that in this case, we have the Keenan case. So that case is controlling law and whether or not if you have excessive force or excessive noise that that which has been alleged clearly and almost to the nth degree alleged in the complaint that we have to take that as true and that there's nothing... Finally, there's nothing in the order of the court or the special master that says, no matter what you do, all the excessive noise you wish in order to accomplish the main objective, and that is to ensure that there are no suicides. Your honor, we do accept Mr. Rico's allegations as true, but Mr. Rico also alleges and admits that defendants offered him earplugs to help with the noise. They also offered him mental health referrals and gave him a chance to file formal grievances. They were responsive in their request and ignore his complaint. So while one part of the complaint might say, oh, they did nothing to help, but really the other parts of the complaint show that they did things to help the situation, to help him. Because the existing case law here, Keenan, Jones v. Nevin, Granning v. Miller-Stout, none of these cases would have given fair warning that what they specifically did was unconstitutional and that's why this court should reverse the denial of false immunity and dismiss this case. Thank you. All right. Thank you, counsel, for your helpful arguments. This case is submitted.
judges: Tallman, Silver, Hunsaker